


EXHIBIT A

**MASTER SERVICES AGREEMENT BETWEEN
GS LABS, LLC AND SAVISTA, LLC**

This MASTER SERVICES AGREEMENT (the "Agreement") between Savista, LLC ('Savista"), a Delaware limited liability company, and GS Labs, LLC a Nebraska corporation ("GS Labs"), is effective on the last date signed below (the "Effective Date"). The Agreement shall be in effect commencing on the Effective Date and shall remain in effect until every Statement of Work ("SOW") duly entered into hereunder expires or is terminated (the "Term").

Savista, LLC, and its operating affiliate Savista Global Healthcare Services, LLC offer services which assist customers in improving business processes, operating margin, and cash flow. Savista and Client (both defined below) are deemed a "Party" and collectively, the "Parties".

GS Labs (i) owns healthcare providers and wishes to enter into an agreement for the Savista Service(s) described in the SOW(s), and (ii) represents that it has authority to bind each Client to this Agreement and that this Agreement is binding on each Client.

The Parties agree as follows:

**1.      Definitions.**

"Client" includes GS Labs and those facilities or sites identified on any SOW.

"Client Data" means any data or information transmitted by Client to Savista in connection with the Savista Service(s).

"Deliverable(s)" means any report or other output that Savista delivers to Client as set forth in the applicable SOW. Deliverable(s) do not include any technology or any Savista Proprietary Information.

"Intellectual Property Rights" means the patent rights, copyright rights (including, but not limited to, moral rights), trademarks, trade secret rights, and any other intellectual property rights recognized by the law of any applicable jurisdiction.

"Proprietary Information" means: (i) the terms of this Agreement and its Exhibits, Schedules and SOW(s); (ii) each Party or its business affiliate's business processes, plans and financial information; (iii) Client Data provided to Savista; (iv) protected health information or any identifying patient information (iv) SaaS (defined below); and (v) any other information which is disclosed to another Party which by its nature should reasonably be considered as confidential or proprietary.

"SaaS" means artificial intelligence or machine learning licensed in connection with any Savista Services.

"Savista" means Savista, LLC and its operating affiliate Savista Healthcare Global Services, LLC.

"Savista Service(s)" means Savista's professional, consulting, or contracting services, and any Savista Deliverable(s) identified under any SOW.

"SOW" or "Statement of Work" means any document(s) Savista and Client have executed pursuant to this Agreement that describes any of the Savista Service(s) which are provided to Client.

**2.      Agreement Attachments**. The following attachments, and any future documents executed by the Parties pursuant to the terms hereof, are an integral part of this Agreement and are incorporated by reference:

SOW for Billing and Accounts Receivable Services

**3.      Compensation**.

3.1      Payment for Savista Service(s). Client shall pay Savista the fees set forth in the SOW(s) as consideration for the Savista Service(s). The Parties acknowledge that any modification to the "Clients" set forth in any SOW may require a change in fees charged, and that any change in fees not otherwise provided for in any SOW shall be mutually agreed to by the Parties in writing.

3.2      Taxes Excluded. Unless otherwise stated, Savista fees do not include any local, state, federal or foreign taxes, levies or duties of any nature ("Taxes"). Client is responsible for paying all Taxes, excluding only Taxes based upon Savista's net income. If Savista has the legal obligation to pay or collect Taxes for which Client is responsible under this

section, the appropriate amount shall be invoiced to and paid by Client unless Client provides Savista with a valid tax exemption certificate authorized by the appropriate taxing authority.

3.3     Terms of Payment. Savista shall submit invoices for the services set forth in any SOW entered into pursuant to the terms of this Agreement. Client shall remit payment within fifteen days from the invoice date via electronic payment or Automated Clearing House ("ACH") direct to Savista. Client agrees that it shall not use a third-party payer that charges a fee for any such payment. If Client disputes any part of an invoice, Client shall notify Savista of such dispute and the reason for such dispute within fifteen days of receipt of such invoice. If Client does not pay any amount it owes when due, then Client shall pay interest on the unpaid amount at an annual rate of 18%, compounded monthly, or the maximum amount allowable by law, whichever is less. Savista reserves the right to suspend the services set forth in any SOW in the event Client has any unpaid past-due invoices with Savista or any Savista's affiliate. Client shall reimburse Savista for reasonable attorneys' fees, costs and expenses for any action taken by Savista to collect past due fees under this Agreement or any SOW. For the avoidance of doubt, any invoice(s) past due for more than 60 days is considered a material breach of the Agreement.

3.4     Expenses. Client shall reimburse Savista for all reasonable travel and lodging expenses Savista incurs in performing the services set forth in any SOW.

3.5     Consumer Price Index ("CPI"). Savista, in its sole discretion, may annually increase the fees set forth in any SOW by an amount equal to the lesser of: (i) the Annual CPI; or (ii) 5%. "Annual CPI" means average CPI for the previous 12-month Period in the Professional Services Component of the Medical Index of the "All cities-All urban consumers" index of the Consumer Price Index prepared by the Bureau of Labor Statistics of the United States Department of Labor. Notwithstanding the foregoing, Savista will not apply the CPI annual increase to any contingency fees for services set forth in a SOW.

3.6     Third-Party Fees. Client shall be responsible for the payment of any fees associated with Savista's access to Client's third party systems necessary to provide the Savista Services under this Agreement or any SOW.

**4.     Change Requests and Cooperation.**

4.1     Project Changes. All statements concerning the estimated time to perform the Savista Service(s) are good faith estimates based upon information available at the time made. Further, the fees set forth in each SOW are based on the representations of and the information provided by Client at the time of execution of the SOW. Each SOW is subject to equitable adjustment upon any material change in such information, the occurrence of an excusable delay (as provided in Section 3.2 or Section 3.3 respectively), or upon any modification of the scope, timing or level of Savista Service(s) that the Parties agree to in writing. Any change in scope that modifies the fees or the project schedule must be agreed to in writing by the Parties.

4.2     Failure to Cooperate. If Client impedes or delays completion of the Savista Service(s) by: (i) failing or delaying to provide necessary information, equipment or access to facilities to Savista; (ii) failing to complete required tasks or perform its obligations under this Agreement, for any reason; or (iii) providing materially untrue or incorrect information; then Savista's failure or delay in completion shall be excused.

4.3     Support Exclusions. Savista has no obligation to provide ongoing support services for: (i) any professional service provided by Savista outside of the scope of any SOW; (ii) any third-party computer program, technology, or hardware; (iii) any customized services, other than as specifically set forth in an SOW; or (iv) any customized services arising out of or relating to a change in Client's systems or data.

**5.     Client Commitments**. Client shall: (i) be available to assist Savista's personnel by answering questions and promptly providing documents and data in the format reasonably requested by Savista; (ii) participate in Savista Service related meetings; (iii) contribute to system and data integrity testing; (iv) timely and appropriate access to any Client systems necessary to complete the Savista Service(s); and (v) assist Savista with any activities or tasks required to complete the Savista Service(s); and (vi) any other requirements set forth in a SOW.

**6.     Confidentiality**.

6.1     Treatment of Proprietary Information. Each Party, as a recipient of Proprietary Information (a "Recipient"), shall: (i) hold all Proprietary Information in confidence; (ii) not disclose any Proprietary Information to any person outside of the Recipient's business organization (except to Recipient's contractors and consultants in connection with the Recipient performing its obligations under this Agreement and only if the Recipient's contractors and consultants are subject to appropriate nondisclosure obligations consistent with the obligations in this Section 6); (iii) only disclose Proprietary Information within its organization on a "need-to-know" basis to individuals who understand the confidential nature of the Proprietary Information; and (iv) treat the Proprietary Information with the same degree of care regarding its secrecy and confidentiality as Recipient treats confidential information within its business organization, but in no event, less than

a reasonable degree of care. Proprietary Information remains the property of the disclosing Party, and its disclosure to the Recipient creates only a limited right for the Recipient to use the Proprietary Information in furtherance of its obligations under this Agreement or as otherwise provided for herein.

6.2        <u>Exceptions</u>. Recipient's confidentiality and nondisclosure obligations do not apply to any information that:

(i)        is or becomes publicly available (other than by a breach of this Agreement), including any information filed with any governmental agency and available to the public;
(ii)       is obtained from a third party that to its knowledge is legally entitled to disclose the information;
(iii)      Recipient can document it knew before the disclosing party disclosed the information; or
(iv)      Recipient can document it developed independently of any disclosure made by the disclosing party.

6.3        <u>Legal Obligations to Disclose</u>. If Recipient is requested or required by a subpoena, court order, or other legal or regulatory requirement to disclose any Proprietary Information, then Recipient may disclose only the portion of the Proprietary Information that its counsel recommends is required to be disclosed. The Recipient shall make reasonable efforts tonotify the disclosing Party in writing, within 24-hours of receipt, of the obligation to disclose so that the disclosing Party may seek a protective order or other appropriate remedy or waive compliance with the provisions of this Agreement.

6.4        <u>Client Data</u>. All Client Data is Proprietary Information of Client and each Client represent and warrant that it will only provide to Savista the data that it owns, or has the right and license to use. Client grant to Savista and any current or future Savista affiliate, a non-exclusive, fully-paid, royalty-free, and irrevocable right and license to use and modify Client Data. The use and modification of any such Client Data that is subject to the Department of Justice Guidelines on aggregation of pricing data will be in compliance with these Guidelines if applicable.

Additionally, any use of Protected Health Information must be in full compliance with: (i) HIPAA; (ii) the HITECH Act; and (iii) any Business Associates Agreement entered into by the Parties during the Term.

6.5        <u>HIPAA</u>. The Parties agree to comply with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

6.6        <u>Information Security Incidents</u>. In the event either Party experiences an Information Security Incident it shall promptly notify the other Party. For the purposes of this paragraph, an "Information Security Incident" means any actions or omissions including but not limited to ransomware, malware, and data breach incidents that compromise the security, confidentiality, or integrity of any safeguards put in place that relate to or impact data and systems of the Parties that interact. Upon receiving such notice, such Party may immediately suspend access to its systems, services and products until such time as it reasonably determines there is no longer a security risk.

6.7        <u>Duration of Obligations</u>. This Section 6 governs any disclosure of Proprietary Information made during the Term. The nondisclosure obligations of the Recipient under Section 6.1 remain in effect for a period of 36 months following the expiration or termination of this Agreement provided, however.

6.8        Regardless of any provision in this Agreement that conflicts or may appear to conflict:

(i)        Nothing in this Agreement prohibits Client from disclosing information in order to comply with a court order, subpoena, or similar legal process, or from providing truthful testimony in connection with a legal proceeding, including any proceeding conducted by a state or federal agency, provided that any confidential information disclosed is designated and otherwise treated as confidential; and
(ii)       Client shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Accordingly, Client may disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. Client may also disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b).

**7.        Warranty**.

7.1        <u>Warranties of Savista</u>. Savista represents and warrants that the Savista Service(s) will be performed in a professional manner during the term of the applicable SOW (the "Warranty Period").

7.2     Sole and Exclusive Remedy. Client's sole and exclusive remedy, and Savista's sole and exclusive liability, for a breach of the representations and warranties in Section 7.1 are: (i) repeating or reprocessing of the Savista Service(s) (if possible) by Savista at no additional charge; (ii) claim for damages to GS Labs caused by Savista's willful misconduct or gross negligence, or (ii) termination pursuant to the terms of Section 9.2.

7.3     Disclaimers. EXCEPT FOR THE WARRANTIES SET FORTH IN THIS AGREEMENT, SAVISTA EXPLICITLY DISCLAIMS ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED BY LAW, USAGE OF TRADE, COURSE OF DEALING OR OTHERWISE, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CLIENT UNDERSTANDS AND AGREES THAT NEITHER SAVISTA NOR ITS SUPPLIERS IS ENGAGED IN THE PRACTICE OF MEDICINE. THE SERVICES ARE NOT A SUBSTITUTE FOR PROFESSIONAL MEDICAL REVIEW AND JUDGMENT. CLIENTS ARE RESPONSIBLE FOR VERIFYING THE ACCURACY OF ALL PATIENT, VISIT AND OTHER INFORMATION AND/OR DATA IN OR GENERATED BY THE SERVICES BEFORE ACTING ON OR ALLOWING IT TO BE USED FOR CLINICAL PURPOSES. SAVISTA IS NOT RESPONSIBLE FOR AND SHALL HAVE NO LIABILITY FOR CLAIMS BY CLIENT OR OTHERS RELATING TO: (I) THE ACCURACY OF DATA ORIGINATING FROM THIRD PARTY CONTENT DATABASES OR SYSTEMS, (II) ANY DATA ENTERED OR PROVIDED BY CLIENT, INCLUDING THE ACCURACY OF CODES, (III) ANY BODILY INJURY OR DEATH RESULTING FROM CLIENT'S OR ANY HEALTHCARE PROVIDER'S RELIANCE ON THE PATIENT INFORMATION IN OR GENERATED BY THE SERVICES, OR (IV) BACKUP AND RECOVERY OF ANY DATABASE AND ANY STORED DATA. CLIENT UNDERSTANDS THAT SAVISTA IS RELYING UPON DATA, INFORMATION, AND DOCUMENTATION PROVIDED BY CLIENT, AND SAVISTA IS NOT RESPONSIBLE FOR AND SHALL HAVE NO LIABILITY FOR ANY CLIENT DATA, INFORMATION, OR DOCUMENTATION QUALITY AND INTEGRITY ISSUES THAT INHIBIT SAVISTA FROM PROVIDING THE SERVICES UNDER ANY SOW.

**8.     Indemnification, Insurance and Limitation of Liability**.

8.1     General Indemnification. Each Party shall defend, indemnify, and hold the other harmless against all claims, losses, damages and costs, including reasonable attorneys' fees and expenses, arising out of any action brought by any third-party in connection with any negligent act, omission or breach of any obligation under this Agreement by the indemnifying party or by any of that party's employees, officers or agents. Neither Party is responsible for losses incurred by reason of the other Party's negligence or willful misconduct.

8.2     Notice of Indemnification Claims. Indemnified Party shall give Indemnifying Party prompt written notice (a "Claim Notice") of any Losses or discovery of facts on which Indemnified Party intends to base a request for indemnification under Section 8.1 (General Indemnification). Indemnified Party's failure to provide a Claim Notice to Indemnifying Party under this Section 8.2 does not relieve Indemnifying Party of any liability that Indemnifying Party may have to Indemnified Party, but in no event shall Indemnifying Party be liable for any Losses that result from a delay in providing a Claim Notice. Each Claim Notice must contain a description of the third-party claim and the nature and amount of the related Losses (to the extent that the nature and amount of the Losses are known at the time). Indemnified Party shall furnish promptly to Indemnifying Party copies of all papers and official documents received in respect of any Losses.

8.3     Insurance. Savista shall maintain the below coverage with coverage underwritten by an insurance carrier with an A.M. Best Company rating of no less than "A-". All insurance coverages shall not be cancelled or materially amended with less than 30 days' prior written notice to Client.

        8.3.1     Commercial General Liability Insurance. Savista shall maintain on occurrence basis forms: (i) primary commercial general liability insurance to cover Savista and its employees for bodily injury and property damage to third parties in an amount not less than $1 million per occurrence and $2 million general aggregate; (ii) products-completed operations in an amount not less than $2 million aggregate; (iii) blanket contractual liability in an amount of not less than $1 million per occurrence; and (iv) personal and advertising injury in an amount not less than $1 million per occurrence.

        8.3.2     Workers' Compensation/Employer's Liability Insurance. Savista shall maintain workers' compensation coverage as required by statute, which (unless otherwise agreed to by Savista and Client) shall be in the form of a workers' compensation insurance policy. Savista shall maintain employer's liability insurance in an amount not less than: (i) $1 million per accident; (ii) $1 million for disease policy limit; and (iii) $1 million disease coverage per employee.

        8.3.3     Commercial Automobile Liability Insurance. Savista shall maintain primary commercial automobile liability insurance to cover Savista and its employees for bodily injury and property damage to third parties arising from the ownership, maintenance, or use of an owned, non-owned, or hired vehicle in an amount not less than $1 million combined single limit.

       8.3.4    <u>Umbrella Liability Insurance</u>. Savista shall maintain an umbrella liability or excess liability insurance policy of not less than $5 million per occurrence and $5 million aggregate, in addition to the required commercial general liability, employer's liability, and commercial automobile liability coverages.

       8.3.5    <u>Professional Liability Insurance</u>. Savista shall maintain professional liability insurance covering financial loss resulting from:

           (i)    any negligence or error or omission in the rendering of professional services under the Agreement, as applicable, in an amount not less than $5,000,000 per occurrence and $5 million annual aggregate; and

           (ii)    any security or privacy incident or breach, network security failure, data damage, destruction or corruption, unauthorized access, unauthorized use, virus transmission, denial of service, unauthorized disclosure of nonpublic personal or corporate information, or loss of income from, in the rendering professional services under the Agreement, as applicable, in an amount not less than $5 million per occurrence and $5 million annual aggregate.

8.4    <u>Limitation of Liability</u>. Client acknowledges that Savista's consulting services are advisory in nature and that should Client desire to implement any recommendations made, Client is solely responsible for the results therefrom. Client is solely responsible for its compliance with state and federal statutes, laws, regulations, policies or other governmental regulations including Medicare reimbursement, and accurate and complete code assignment. Savista is not liable for claims attributable to any errors, omissions, or other inaccuracies in the information or material contained in the Client Data or data Savista receives from third-parties. EXCEPT FOR CLIENT'S FAILURE TO PAY FOR THE SAVISTA SERVICE(S), THE MAXIMUM LIABILITY OF EITHER PARTY ARISING OUT OF OR RELATED TO THIS AGREEMENT, REGARDLESS OF LEGAL THEORY (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL NOT EXCEED THE SUM OF $500,000.

IN NO EVENT SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE FOR INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE SAVISTA SERVICE(S) (including, without limitation, any damages for lost or damaged files or data, lost profits, lost savings, or loss of business opportunity or goodwill), EVEN IF INFORMED OF THE POSSIBILITY IN ADVANCE.

This limitation of liability is fundamental to this Agreement. The Parties reviewed and bargained these terms and neither Party would be willing to enter into this Agreement without this limitation.

**9.    Termination**.

9.1    <u>Termination of Agreement for Breach</u>. If any Party breaches any material provision of this Agreement (excluding any SOW), then the non-breaching Party shall provide written notice of the breach to the other Party. If the breaching Party fails to cure the breach within 30 days after receiving written notice, then the non-breaching Party may terminate the Agreement, and all attached SOWs, in its sole discretion, by providing a letter of termination to the breaching Party specifying the exact date of termination.

9.2    <u>Termination of any SOW for Breach</u>. If any Party breaches any material provision of any SOW, then the non-breaching Party to the SOW shall provide written notice of the breach to the other Party to the SOW. If the breaching Party fails to timely cure the breach within 30 days after receiving written notice, then the non-breaching Party may terminate only the applicable SOW, in its sole discretion, by providing a letter of termination to the breaching Party specifying the exact date of termination of the SOW.

9.3    <u>Effect of SOW Expiration or Termination</u>. Expiration of any SOW's term, or termination of any SOW, does not terminate this Agreement, or any remaining SOWs, unless the terminating or expiring SOW is the last-remaining SOW in effect, in which case its termination or expiration will terminate the Agreement.

**10.    General Provisions**.

10.1    <u>Statutory Audit Rights for Services</u>. In connection with 42 U.S.C. § 1395x(v)(1)(I) (and the implementing regulations set forth at 42 C.F.R. §§ 420.300-.304), and until the expiration of four years after the furnishing of the Savista Service(s), Savista shall grant to the Secretary of the Department of Health and Human Services, the Secretary's duly-authorized representative, the Comptroller General of the United States, or the Comptroller General's duly-authorized representative, the right to review any and all books, documents, and records as may be necessary to certify the nature and extent of the costs of the services in excess of $10,000 per year. If Savista performs any of its duties under this Agreement by way of a subcontract with a related organization, and the value or cost of those subcontracted duties is $10,000 or more over a 12-month period, then that subcontract shall contain a clause to the same effect as this Section 10.1.

10.2 <u>Compliance with Law</u>. Throughout the Term each Party's respective performance under this Agreement shall comply with all applicable federal, state, and local laws and regulations.

10.3 <u>Staffing</u>. Savista shall have sole discretion to utilize Savista's global colleagues to assist in any provision of Savista Services.

10.4 <u>Subcontractors</u>. Savista may use subcontractors as necessary to provide the Savista Services, so long as subcontractors are parties to a confidentiality agreement and/or Business Associate Agreement, as necessary. Further, Savista may only use subcontractors with substantially similar industry experience and skill, as Savista.

10.5 <u>Force Majeure</u>. The performance of any obligations to be performed under this Agreement (other than an obligation to pay money or issue credit) is excused to the extent that performance is prevented or delayed by an act of God or the public enemy, pandemic, terrorism, insurrections, riots, fire, explosion, flood, government order, hacker attacks, the acts or omissions of any third parties not under the control of either party, or other reasonably unforeseeable causes beyond the control and without fault or negligence of the Party so affected and if, by the exercise of due diligence, the Party is unable to prevent or overcome the event. The Party so affected must give prompt written notice to the other Party of the cause and take whatever reasonable steps are necessary to relieve the effect of the cause as rapidly as possible.

10.6 <u>Facsimile/Electronic Mail</u>. All documents pertaining to this Agreement may be executed by the exchange of faxed executed copies, certified electronic signatures or copies delivered by electronic mail in Adobe Portable Document Format or similar format including DocuSign. Any signature transmitted by those shall be deemed an "original signature". All documents pertaining to this Agreement may be executed in two or more counterparts, but all of which, taken together, shall constitute one and the same instrument.

10.7 <u>Governing Law</u>. This Agreement will be governed by, and construed and interpreted according to, the substantive laws of the State of Delaware.

10.8 <u>Waiver of Jury Trial</u>. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

10.9 <u>Independent Contractor</u>. The relationship of Savista to Client created by this Agreement is that of an independent contractor; there is no relationship of agency, partnership, joint venture, employment, or franchise between the Parties and neither party owes the other a fiduciary duty.

10.10 <u>No Third-Party Beneficiaries</u>. This Agreement is intended for the benefit of the Parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person or entity.

10.11 <u>Non-Solicitation</u>. No Party may, directly or indirectly, solicit, recruit, or otherwise encourage any employee of the other Party to leave his or her employment with that other Party for any reason. This restriction applies during the Term and for a period of 12 months after the termination or expiration of this Agreement. The preceding sentence does not, however, prohibit either Party from: (i) soliciting employment by placement of general advertisements for employees on any internet site, in newspapers, or via other media of general circulation not specifically directed at the employees of the other Party; or (ii) soliciting persons identified through employment search firms that are not specifically directed at the employees of the other Party.

10.12 <u>Notices</u>. Any notices or other communications required or permitted to be given under this Agreement shall be in writing and delivered by personal delivery, overnight courier service, or registered or certified mail (return receipt requested, postage prepaid) and e-mail. Notices are deemed to have been given on the later of: (i) the date when personally delivered; (ii) the date which immediately follows the date of delivery to an overnight courier service; or (iii) the date which is 7 days from the date of deposit in the United States Postal Service in the manner described in this Section 10.12. Notices shall be addressed as indicated below, and either Party may change its address in accordance with this Section 10.12.

| If to | Savista: | If to | Client: |
|---|---|---|---|
| | Attn: Legal/Contracting | | Attn: |
| | Savista, LLC | | GS Labs, LLC |
| | 200 North Point Center East, Suite 600 | | 17650 Wright St, Suite 5 |
| | Alpharetta, GA 30022 | | Omaha, NE 68130 |

10.13 <u>Publicity/Use of Marks</u>. Savista may include Client in its listing of clients and may announce Client's selection of Savista to perform the Savista Service(s) in its marketing communications. Except as otherwise agreed to by the Parties in writing, neither Party may: (i) use each other's trademarks or service marks; or (ii) make any press release or

other public disclosure regarding this Agreement or the transactions contemplated by this Agreement without the other Party's prior written consent, except as required under applicable law or by any governmental agency, in which case the Party required to make the press release or public disclosure shall use commercially reasonable efforts to obtain the approval of the other Party as to the form, nature and extent of the press release or public disclosure prior to issuing the press release or making the public disclosure.

10.14   Severability. In the event that any provision of this Agreement is held to be illegal, or otherwise unenforceable, that provision shall be severed and the remainder of the Agreement shall continue in full force and effect; provided, however, that if the severing of that provision results in a material alteration of this Agreement, the Parties shall equitably adjust the remaining provisions of this Agreement so that no Party benefits disproportionately.

10.15   Assignment. Neither Party shall assign this Agreement without the other Party's consent, except that it may freely assign it to its parent entity, or any subsidiary, or as part of a change of control transaction. Any attempt to assign this Agreement without proper consent will be of no effect. Subject to the foregoing, this Agreement is for the benefit of, and will be binding upon, the Parties' respective successors and permitted assigns.

10.16   Survival. The provisions of Sections 6 (Confidentiality), 7 (Warranty), 8 (Indemnification and Limitation of Liability and 10 (General Provisions) survive the termination or expiration of this Agreement. Additionally, undisputed obligations to pay for goods or services provided prior to the expiration or termination of this Agreement, or expiration or termination of any SOW, survive and are payable within 30 days of the effective date of the expiration or termination.

10.17   Waiver. The waiver of any breach of any term or condition of this Agreement does not waive any other breach of that term or condition or of any other term or condition, unless agreed to in a writing signed by the Parties. The failure by either party to insist upon strict performance of any provision of this Agreement shall in no way constitute a waiver of rights under this Agreement, at law or in equity.

10.18   Vaccination Mandates. Savista shall comply with all applicable OSHA and CMS regulations requiring vaccination of staff to the extent such regulations require Savista's staff to be vaccinated as determined by Savista in its sole discretion. Client understands and acknowledges that few if any of Savista's employees and contractors work on site and as such may not be subject to government-issued vaccination requirements. Notwithstanding any language that may conflict or appear to conflict, Client shall not impose or attempt to impose any obligation on Savista to ensure any Savista staff or contractors are vaccinated unless and until a vaccination requirement applicable to such staff is expressly mandated by a government authority.

Savista understands and acknowledges that it is responsible for complying with all applicable OSHA regulations, including the COVID-19 Vaccination and Testing; Emergency Temporary Standard. Client understands and acknowledges that **except as set forth in the next sentence**: Client has no authority to impose any workplace safety requirements or other vaccination, disease testing, or health standards on Savista or its employee population, and shall not impose or attempt to impose any vaccination, disease testing, masking, disease-related documentation, or other such requirements on Savista or its employees. **In the event any Savista employees work on-site at any Client owned or operated healthcare campus or healthcare facility, then all such on-site employees shall be required to comply with any and all health and safety requirements mandated by the Client.**

10.19   Entire Agreement and Amendment. This Agreement, together with all attached Exhibits, Schedules, and SOWs, contains the entire understanding between the Parties with respect to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, with respect to the subject matter of this Agreement. The express terms of this Agreement, together with all attached Exhibits, Schedules, and SOWs, control and supersede any course of performance or usage of the trade inconsistent with any of the terms of this Agreement. This Agreement, any Exhibit, any Schedule, or any SOW may not be modified or amended other than by an agreement in writing signed by both Parties. In the event of a conflict between the terms of this Agreement and the terms of any SOW, then the terms of the SOW will control.

DocuSign Envelope ID: 8C1102F1-9D52-48D6-BF87-4361F9DC5F2E

IN WITNESS WHEREOF, the Parties have executed this Agreement through their duly authorized representatives as of the Effective Date.

| **SAVISTA, LLC**<br>On behalf of itself and its affiliate | **GS LABS, LLC** |
|---|---|
| | DocuSigned by:<br>*kelly Strong*<br>4EEEDF46DBC2480... |
| Signature | Signature |
| | Kelly Strong |
| Printed Name | Printed Name |
| | SVP Healthcare  11/22/2021 |
| Title                           Date | Title                           Date |

**SOW FOR BILLING AND ACCOUNTS RECEIVABLE SERVICES**

1.    **Term.** The services provided under this SOW ("Billing and A/R Services") shall be provided by Savista Global Healthcare Services, LLC and shall commence on the Effective Date (the "Billing and A/R Services Effective Date") and continue for six months from the Live Status date (the "Billing and A/R Services Term").

The Billing and A/R Services automatically renew for successive six-month extensions unless either party gives written notice to the other Party at least 60 days prior to the expiration of the then current term of its desire not to renew the Billing and A/R Services. Collectively, the Billing and A/R Services Initial Term and all renewals thereafter shall be called the "Billing and A/R Services Term".

2.    **Client List**. Individual sites covered by this SOW (each a "Client" for the purposes of this SOW) are listed below. Each site must be listed individually (i.e. multiple sites shall not be grouped under a common name) to receive the services. GS Labs may request Savista to add a site to the list of Clients through an amendment to this SOW. GS Labs represents and warrants it has the legal authorization to execute this SOW on behalf of itself and each Client.

| CLIENT LIST | | |
|---|---|---|
| Facility ID | Client Name | Facility City, State |
| 29927 | GS Labs, LLC | Omaha, NE |

3.    **Definitions.** The following definitions are in addition to those contained in the Agreement and shall pertain to the Billing and A/R Services:

ARS mean Accounts Receivable Services.

FTE means Full-Time Employee.

Live Status means written confirmation by Savista that Client has materially completed the obligations set forth in Section 5.2 below. For purposes of this notification, electronic mail shall be deemed "writing".

SLA means Service Level Agreement.

4.    **Fees.** Savista fees shall equal a cumulative fee of both Billing and ARS FTEs cost (the "Billing and A/R Services Fee"). Savista shall invoice the total Billing and A/R Services Fees incurred on a monthly basis.

    (i)    During the Billing and A/R Services Term, Savista shall provide Client 23 Billing FTEs at a cost of $1,600 per FTE per month. Total monthly fees due to Savista for billing FTEs will be $36,800 a month;
    (ii)    During the Billing and A/R Services Term, Savista shall provide Client 12 ARS FTEs at a cost of $1,875 FTE per month. Total monthly fees due to Savista for ARS FTEs will be $22,500; and
    (iii)    During the A/R Services Term, Client may increase the number of FTEs for the Billing and A/R Services by providing Savista 60-days' prior notice; and
    (iv)    Client shall be invoiced for the initial billing FTEs in the amount of $36,800 on or promptly after the Billing and A/R Services Effective Date. All subsequential invoices will be sent on or promptly after the Live Status date for each scope and monthly thereafter.

5.    **Description, Deliverables and Obligations.**

5.1    Billing and A/R Services Obligations of Savista. Savista shall:

    (i)    Provide the requested FTE(s) during the Billing and A/R Services Term for hospital billing of commercial and managed care payors. Self-pay and government payors are outside of this scope. The FTE(s) shall work 40 hours per week, except when there is a Savista's company holiday or the colleague is on PTO. Savista will provide Client with reasonable advance notice of any impending holiday;
    (ii)    Hiring and deployment time for colleagues will be as per below mentioned table on respective scope:

| Skillset | Hiring | Internal Training | Client Training | Ramp Period |
|---|---|---|---|---|
| Biller | Two weeks | One week | One week | Two weeks |
| AR Follow Up | Four weeks | Three weeks | One week | Four weeks |

    (iii)    For billing services: Savista will use commercially reasonable efforts to achieve best practice standard of 500 billed claims per FTE per week. It is understood by both Parties that there may be variances to the afore mentioned productivity due to the status of the claim and the work effort required to appropriately process the claim; and

(iv) ==For ARS services: Savista shall perform follow up functions on all existing and subsequently created accounts including making follow up calls to third party payers and correcting claims on payer provided electronic interfaces.==

5.2 <u>Obligations of Client</u>. Client shall:

(i) Provide coding resources and other resources as necessary to work edits as identified by Savista Billing resources;
(ii) Provide list of departments that will be accountable for corrections; and
(iii) Facilitate remote access, training, and provide sign-ons for all computer systems necessary to perform work functions within seven days from access request. If access is not completed within the agreed upon time, Savista will be held harmless of any service level agreements and/or performance guarantees. Systems to which Savista needs access are:
   a) Patient accounting systems;
   b) Billing platform systems;
   c) All other third party payer web portals; and
   d) Report storage system.

5.3 <u>Service Level Agreements</u>. Both Parties agree and acknowledge of following SLA terms:

(i) Quality: 95% accuracy for all scopes;
(ii) The quality will be measured as per parameters and metrics agreed between Client and Savista and documented in the Quality Methodology Document ("QMD"). Client will share any changes to the agreed methodology with Savista and will be applicable from a future date agreed by the Parties. This QMD shall be reviewed, discussed, approved via written confirmation before Live Status;
(iii) Productivity standards applicable to project are as described in below table:

| Scope | Productivity Standards | Unit of measurement |
|---|---|---|
| A/R follow up | 30 per day per colleague | Accounts |
| Billing | 100 per day per colleague | Accounts |

(iv) Service Provider will not be held to this productivity standard during a four-week ramp-up period. During the four-week ramp up period, production SLA will be as follows:
   a) Week 1: 25% of standards;
   b) Week 2: 50% of standards;
   c) Week 3: 75% of standards; and
   d) Week 4: 100% of standards.

In the event of inadequate inventory, the SLA percentage achievement will be computed based Actual accounts worked divided by inventory received.

(v) Any new SLA other than productivity and quality mentioned above shall be discussed and mutually agreed by both parties and baselined on historic data for preceding three months; and
(vi) Commencing 30 days from Live status, and every month thereafter, Savista will review monthly placement volume. If placement volume is greater than 105% of the productivity standards for each service than both parties will mutually agree upon overtime requirements and associated fees to manage increase inventory. In the event increased monthly volumes cannot be met by overtime, both parties shall discuss and mutually agree to deploy additional staff with per standard hiring to ramp timeline as mentioned in clause 5.1 shall apply.

**6. Assignment and Subcontracting.** Notwithstanding anything to the contrary in the Agreement, Savista may assign this SOW upon 30 days prior written notice to Client, with Client's written approval, which shall not be unreasonably withheld. All applicable rights and obligations set forth in the Agreement and this SOW, excluding any non-assigned SOW, must apply to the Party to which this SOW is assigned for such assignment to be valid. Savista may subcontract portions of its obligations under this SOW in its sole, reasonable discretion.

SAVISTA™

**FIRST AMENDMENT TO THE MASTER SERVICES AGREEMENT
BETWEEN GS LABS, LLC AND SAVISTA, LLC**

GS Labs, LLC ("GS Labs") and Savista, LLC ("Savista") entered into an agreement to facilitate the use of the Savista Services dated November 23, 2021 (the "Agreement").

GS Labs and Savista agree to modify the Agreement with this amendment (the "First Amendment") effective on the last date signed below (the "First Amendment Effective Date") as follows:

**1.** The Agreement is modified to include the attached SOW for Accounts Receivable Augmentation Services.

**2.** All defined terms used in this First Amendment shall have the meaning ascribed to them in the Agreement unless otherwise defined herein. Except as expressly modified by this First Amendment, the terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the Parties have caused this First Amendment to be duly executed by their authorized representatives as of the First Amendment Effective Date.

| SAVISTA, LLC | GS LABS, LLC |
|---|---|
|  | DocuSigned by: *Kelly Strong* 4FFFDF46DBC2480... |
| Signature | Signature |
|  | Kelly Strong |
| Printed Name | Printed Name |
|  | SVP Healthcare — 3/30/2022 |
| Title — Date | Title — Date |

29927-124837
CR-0314

1

**SOW FOR ACCOUNTS RECEIVABLE AUGMENTATION SERVICES**

**1.    Term and Termination.**

1.1    SOW Term. The services provided under this SOW ("A/R Services") shall commence on the First Amendment Effective Date (the "A/R Services Effective Date") and continue for 12 months from the Live Status date (the "A/R Services Term").

1.2    SOW Termination. Notwithstanding anything to the contrary in the Agreement, if either Party breaches a material provision of this SOW through no fault of the non-breaching Party or at the direction of the non-breaching Party, then the non-breaching Party to the SOW shall provide written notice of the breach to the other Party to the SOW. If the breaching Party fails to timely cure the breach, then the non-breaching Party may terminate only this SOW by providing a 90-days written notification. Neither Party will be liable for delivery limitations that are outside of their sole control.

**2.    Client List**. Individual sites covered by this SOW (each a "Client" for the purposes of this SOW) are listed below. Each site must be listed individually (i.e. multiple sites shall not be grouped under a common name) to receive the services. GS Labs may request Savista to add a site to the list of Clients through an amendment to this SOW. GS Labs represents and warrants it has the legal authorization to execute this SOW on behalf of itself and each Client.

| CLIENT LIST | | |
|---|---|---|
| Client ID | Client Name | Client City, State |
| 29927 | GS Labs, LLC | Omaha, NE |

**3.    Definitions.** The following definitions are in addition to those contained in the Agreement and shall pertain to the A/R Services:

Bot(s) means, for the purpose of this SOW, the automation process for a single defined process.

Live Status means written confirmation by Savista that Client has materially completed the obligations set forth in Section 5 below. For purposes of this notification, electronic mail shall be deemed "writing".

Referred Accounts means all accounts that are selected by Savista to collect, or placed by Client for Savista's resolution.

RPA means Robotic Process Automation.

**4.    Fees and Payment Terms.**

4.1    Fees. The fees for the A/R Services shall be as set forth below:

(i)    ==For all Collections on Referred Accounts, Savista shall be due a rate of 2.50% of all Collections;==
(ii)   ==Commencing three months from Live Status date, and every three months thereafter, Savista will review monthly collections. If monthly fees paid to Savista does not cover Savista's monthly cost of $120,000 then Client will be invoiced for the difference between monthly cost and actual invoices for the quarter on the next monthly invoice; and==
(iii)  ==Savista will be due the greater of $1,440,000 or 2.5% of Collections on Referred Accounts at the end of the A/R Services Term.==

4.2    Additional Fee Provisions. In the event of termination of this SOW, Client authorizes Savista to continue recovery efforts on any account in their possession and shall be due its fee for all Collections in its billed inventory for a period of 120 days from the effective date of such termination.

**5.    Description, Deliverables and Obligations.**

5.1    A/R Services Obligations of Savista. Savista shall:

(i)    As of the A/R Services Live Status date and on a weekly basis thereafter, process all Client Referred Accounts that remain open with a balance;
(ii)   Savista shall assume responsibility for the following patient accounting functions for selected accounts as described above;
(iii)  Identify opportunities for Savista to apply RPA within the A/R process;
(iv)   Develop, deploy, and maintain Bots to automate process based on opportunity identified;
(v)    Routine maintenance, bug fix, path or error corrections to the deployed Bots;
(vi)   Initiate process re-bills to the appropriate commercial insurance / Managed Care payers, Self-pay, government and other non-managed care payers are not included as part of this SOW;

(vii) Perform follow up functions on all existing and subsequently created accounts including such actions as:
   a) Making follow up calls to third party payers; and
   b) Leverage online payor websites for status and follow up actions.
(viii) Work accounts within the scope of this SOW at its sole discretion using the most effective work strategies and make determination of level of effort based on identified trends in placed inventory;
(ix) Provide payor insights based on data insights gathered through A/R process;
(x) Provide standard weekly and monthly reporting package; and
(xi) Provide Executive Sponsor for the engagement.

5.2   A/R Services Obligations of Client. Within 60 days from the A/R Services Effective Date, Client shall refer all commercial insurance / Managed Care accounts to Savista that remain open with a balance. Client must:

(i) Work with Savista to provide recurring patient accounting files as needed to complete obligations of this SOW:
(ii) Provide accurate and timely submission of appropriate charge information necessary to bill as well as all coding information requirements;
(iii) Facilitate remote access, training, and provide sign-ons for all computer systems necessary to perform work functions within seven days from access request. If access is not completed within the agreed upon time, Savista will be held harmless of any service level agreement's and/or performance guarantees. Systems to which Savista needs access are:
   a) Patient accounting systems;
   b) Billing platform systems;
   c) All other third party payer web portals; and
   d) Report storage system.
(iv) Handle incoming / outgoing calls to patients;
(v) Handle all print and mail claims which includes but not limited to primary / secondary insurance EOBs, medical records & paper appeals;
(vi) Assume responsibility of stage 2 appeals and litigation efforts;
(vii) Make available to Savista all Explanation of Benefits ("EOBs") and electronic remittance; and
(viii) Provide access to management and IT staff as needed.

**6.     Additional Terms and Conditions.**

6.1   Assignment and Subcontracting. Notwithstanding anything to the contrary in the Agreement, Savista may assign this SOW upon 30 days prior written notice to Client. All applicable rights and obligations set forth in the Agreement and this SOW, excluding any non-assigned SOW, must apply to the Party to which this SOW is assigned for such assignment to be valid. For the avoidance of doubt, no assignment will be valid unless the assignee agrees, in writing, to all required information privacy and confidentiality constraints as required by GS Labs or listed in the Agreement. Savista may not subcontract portions of its obligations under this SOW without advanced written approval from GS Labs.

6.2   Exclusive Agent. Client designates Savista as each Client's exclusive agent for A/R Services. Clients must not engage any in house resources or other third party to provide any of the A/R Services during the A/R Services Term.

6.3   RPA. Savista shall retain ownership in all RPA Bots identified or utilized in the provision of services under this SOW.



**SECOND AMENDMENT TO THE MASTER SERVICES AGREEMENT
BETWEEN GS LABS, LLC AND SAVISTA, LLC**

GS Labs ("GS Labs") and Savista, LLC ("Savista") entered into an agreement to facilitate the use of the Savista Services dated November 23, 2021 (the "Original Agreement"). The Original Agreement with the subsequent amendments entered into by the Parties hereto shall collectively be referred to hereafter as the "Agreement".

GS Labs and Savista agree to modify the Agreement with this additional amendment (the "Second Amendment") effective on the last date signed below (the "Second Amendment Effective Date") as follows:

1. The Agreement is modified to include the attached SOW for Accounts Receivable Workdown Services.

2. All defined terms used in this Second Amendment shall have the meaning ascribed to them in the Agreement unless otherwise defined herein. Except as expressly modified by this Second Amendment, the terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the Parties have caused this Second Amendment to be duly executed by their authorized representatives as of the Second Amendment Effective Date.

| **SAVISTA, LLC** | | **GS LABS, LLC** | |
|---|---|---|---|
| DocuSigned by: *Natalie Gray* | | DocuSigned by: [signature] | |
| Signature | | Signature | |
| Natalie Gray | | Greg Wilson | |
| Printed Name | | Printed Name | |
| Deputy General Counsel | March 31, 2023 | VP Finance | March 31, 2023 |
| Title | Date | Title | Date |

**SOW FOR ACCOUNTS RECEIVABLE WORKDOWN SERVICES**

**1.     Term.** The services provided under this SOW ("A/R Workdown") shall commence on the Second Amendment Effective Date (the "A/R Workdown Effective Date") and continue for 12 months from the last Live Status date (the "A/R Workdown Term").

**2.     Client List.** Individual sites covered by this SOW (each a "Client" for the purposes of this SOW) are listed below. Each site must be listed individually (i.e. multiple sites shall not be grouped under a common name) to receive the services. GS Labs may request Savista to add a site to the list of Clients through an amendment to this SOW. GS Labs represents and warrants it has the legal authorization to execute this SOW on behalf of itself and each Client.

| CLIENT LIST | | |
|---|---|---|
| Client ID | Client Name | Client City, State |
| 29927 | GS Labs, LLC | Omaha, NE |

**3.     Definitions.** The following definitions are in addition to those contained in the Agreement and shall pertain to the A/R Workdown:

Collections means the total sum of monies collected or posted by Savista or Client, and includes applicable payments received by Client for clinical services rendered for Referred Accounts.

Client Referred Accounts means all accounts that are selected by Savista to collect or placed by Client for Savista's collection within the scope set forth in Section 5.2 below.

Live Date means the date on which Savista begins actively providing the services under Section 5.1 in this SOW.

Live Status Notification means written confirmation by Savista that Client has materially completed the obligations set forth in Section 5 below. For purposes of this notification, electronic mail shall be deemed "writing".

Stated Placement Value means the remaining balance on a Referred Account to Savista which may or may not include contractual adjustments, known discounts and payments already received on account.

Takeback means any request by a third-party payer or audit firm to recoup monies already paid to Client for accounts referred to Savista. Takeback shall exclude Medicare or Medicaid disproportionate share hospital ("DSH") payments, advances (e.g., periodic interim payments ("PIPs")), cost report settlements, or any other funding or amounts received except to the extent that any of the foregoing payments, funding, or other amounts are designated as applying or relating to specific patient accounts.

Term 1 Attribute means the tag applied to an account for actions completed during the initial agreement effective June 1, 2022 – March 31, 2023.

Term 2 Attribute means the tag applied to an account for actions completed during the term for the live date of this SOW.

**4.     Fees and Payment Terms.**

4.1     Fees. The fees for the A/R Workdown shall be as set forth below:

(i)     For Collections on Client Referred Accounts, after the Live Date of this SOW, Savista shall be due a rate of 42% for all Collections, regardless of date Savista denoted attribute applied. This includes all accounts in the placed open inventory, **excluding** accounts currently in arbitration, litigation, letter of agreement ("LOA") or payer settlement negotiations. **Refer to SOW, Exhibit A** for the applicable inventory placed – a detailed listing of applicable inventory shall be provided. For Client Referred Accounts within SOW, Exhibit A, if no Savista attribute has been applied thus far, and the only touch performed is posting a payment, Savista will post such payment and the attribute will not be updated and no contingency rate will apply. Payment for Collections, shall be on a monthly basis with appropriate supporting documentation reconciled between bank deposits and payments posted;

(ii)    For Client Referred Accounts identified as currently in arbitration, litigation, LOA, or payer settlement negotiation status, Savista shall be due 8% of Collections for accounts with a Savista attribute. **Refer to SOW, Exhibit B** for the applicable total inventory placed and estimated claim actions be further processed– a detailed listing of applicable inventory shall be provided. Payment for Collections, shall be on a monthly basis with appropriate supporting documentation reconciled between bank deposits and payments posted. Savista must increase bot machine and/or employee capacity for the volume of work required to meet the applicable timely filing requirements;

    (iii)    For Client Referred Accounts within SOW, Exhibit B, with a Savista Term 1 Attribute attached (as of 3.31.23), during the June 1, 2022 – March 31, 2023 time period, Savista will be due 2.5% of Collections posted through July 31, 2023 **if no other touch was performed after March 31, 2023**. The aforementioned account listing is referenced in SOW, Exhibit C. If a Savista Term 2 Attribute is applied to Client Referred Accounts within SOW, Exhibit B after March 31, 2023 **for additional actions**, the 8% rate will apply. However, if a payment was received on or before March 31, 2023 and Savista ONLY posts the payment to an account with a Term 1 attribute placed by March 31, 2023 (for activity from June 1, 2022 to March 31, 2023), Savista will not update the attribute and the 2.5% rate will apply. If no Savista attribute has been applied thus far, and the only touch performed is posting a payment, Savista will post such payment and the attribute will not be updated and no contingency rate will apply. Payment for Collections, shall be on a monthly basis with appropriate supporting documentation reconciled between bank deposits and payments posted. Fees for January 2023 - March 2023 shall be reduced by $70,000 per invoice, for a total fee credit of $210,000 on the inventory referenced in SOW, Exhibit C with the Savista Term 1 Attribute; and

    (iv)    Savista shall request a final Client Referred Account summary, as of the Live date of this SOW, to be delivered to Savista within three business days, following Live date, for each Exhibit.

4.2    <u>Additional Fee Provisions</u>. The following additional fee provisions shall apply to the services set forth hereunder:

    (i)    In the event of termination or expiration of this SOW, Savista is authorized but not obligated to continue recovery efforts on any accounts in its possession for a period of 120 days from the effective date of such termination or expiration ("Rundown Period"). Savista shall be due its fee for all Collections during that Rundown Period. During the Rundown Period the terms of the Agreement and this SOW will apply; and

    Savista shall be due its fee for all Collections received within 365 days from the effective date of the termination or expiration to account for delayed Collections, pending arbitration, litigation, and payer settlements on accounts worked during the A/R Workdown Term.

**5.**    **Description, Deliverables and Obligations.**

5.1    <u>A/R Workdown Obligations of Savista</u>. Savista shall:

    (i)    As of the Live Date, Savista shall process all Client Referred Accounts that remain open with a balance. Accounts in SOW, Exhibit B will be processed, if so directed by Client. Savista shall dedicate adequate and timely resources to accounts in SOW, Exhibit B to facilitate timely efforts by Client to settle said accounts. Additionally, Client may request, and Savista will comply, with directive to not perform further billing/rebilling/appeals for accounts in SOW, Exhibit B.

    (ii)    From the Live Date, Savista shall assume responsibility for the following patient accounting functions for selected accounts as described above;
        a) Perform follow up functions on all existing and subsequently created accounts including making follow up calls to third party payers;
        b) Submit all new bills, re-bills, appeals, and 2nd appeals, to the appropriate commercial insurance / Managed Care ("In Scope Accounts") payers. Self-Pay, government, and non-managed care payers are excluded from this SOW; and
        c) Handle all print and mail claims which includes but not limited to primary / secondary insurance EOBs, medical records and paper appeals.

    (iii)    Work accounts within the scope of this SOW, referenced in SOW, Exhibit A, at its sole discretion using the most effective work strategy and make determination of level of effort based on identified trends for the placed inventory; For clarity, efforts to support timely settlement of accounts that are, or may become, subject to arbitration, litigation, LOA, or payer settlement negotiations, referenced in SOW, Exhibit B, will take priority to expedite account settlements.

    (iv)    Savista will post payments as directed by the client at the applicable rate outlined in section 4.1 above;

    (v)    Identify automation opportunities to work inventory more efficiently and effectively, at Savista's expense;

    (vi)    Develop, deploy, and maintain automation technologies and tools, at Savista's expense

    (vii)    Provide standard weekly and monthly reporting package, to include a full reconciliation of bank deposit to payment posting activity associated with monthly invoice; and

    (viii)    Provide Executive Sponsor for engagement.

5.2    <u>A/R Workdown Obligations of Client</u>. Client shall:

    (i)    As of the Live Date, refer to Savista the entire inventory of remaining open balance accounts that are currently reflected in SOW, SOW, Exhibit A and B;

    (ii)    Only remove accounts from Savista's inventory in the event a Client Referred Account is frozen by a judge as part of a legal proceeding;

(iii) Work with Savista to send recurring patient accounting files in the format outlined in the data request document provided during implementation to assist with inventory management and reporting;
(iv) Provide a quarterly account payment summary for 365 days following the effective date of the termination or expiration;
(v) Provide accurate and timely submission of appropriate charge information necessary to bill as well as all coding information requirements. Charge information can be submitted in electronic format;
(vi) Facilitate remote access, training, and provide sign-ons for all computer systems necessary to perform work functions on Referred Accounts within seven days of request submission. If access is not completed within the agreed upon time, Savista will be held harmless of any service level agreements and/or performance guarantees. Savista will comply with Client protocols and policies regarding access to Client's network and associated systems. Systems to which Savista needs access are:
  a) Patient accounting systems;
  b) Billing platform systems;
  c) All other third-party payer web portals; and
  d) Report storage system.
(vii) Assume responsibility of arbitration and litigation efforts;
(viii) Make available to Savista all Explanation of Benefits ("EOBs") and electronic remittance;
(ix) Handle incoming/outgoing patient calls;
(x) Provide access to management and IT staff as needed;
(xi) Provide Savista with all information and reasonable assistance that Savista may request to resolve issues with payers;
(xii) Share with Savista status of payors in arbitration, negotiations or litigation on a weekly basis allowing Savista full visibility of settlement efforts to align its AR follow up strategy; and
(xiii) Provide access to all payment reports in client host system for reporting and invoicing purposes.

## 6. Additional Terms and Conditions.

6.1 <u>Assignment and Subcontracting</u>. Notwithstanding anything to the contrary in the Agreement, Savista may assign this SOW upon 30 days prior written notice to Client. All applicable rights and obligations set forth in the Agreement and this SOW, excluding any non-assigned SOW, shall apply to the Party to which this SOW is assigned for such assignment to be valid. Savista may subcontract portions of its obligations under this SOW in its sole, reasonable discretion.

6.2 <u>Exclusive Agent</u>. Client designates Savista as Client's exclusive agent for A/R Workdown. Client must not engage any other third party to provide any of the A/R Workdown during the A/R Workdown Term, except those accounts that were previously placed with another third party. Savista acknowledges that accounts currently in arbitration, litigation, LOA, and/or settlement negotiation efforts being pursued by Client, does not constitute A/R Workdown as it relates to this Exclusive Agent provision.

6.3 <u>Takeback</u>. Savista will issue a fee credit for any Takeback amount where Savista originally processed the account and received payment. Any such fee credit will be credited at the original contingency fee rate applied to the account. Any claim worked by Savista where a contingency fee was applied/paid, that subsequently results/resulted in an overpayment or Takeback for any reason, will be subject to a fee credit.

6.4 <u>Material Change</u>. If Client changes any of the referral or processing protocols set forth in Section 4, of this SOW, or if there are regulatory limitations, changes, and/or impacts related to the Public Health Emergency that limit, restrict, or impact Savista's or the client's ability to perform the responsibilities outlined in Section 5.1 and 5.2, then Savista may terminate this SOW by providing Client 60 days prior written notice of its intent to terminate this SOW pursuant to this Section 6.4.

## 7. SOW, Exhibits.
The following exhibits are attached thereto and are to be considered an integral part hereof and are incorporated into this SOW by reference:

SOW, SOW, Exhibit A: Open Account Summary, subject to 42% collection rate
SOW, SOW, Exhibit B: Open Account Summary, subject to 8% collection rate
==SOW, SOW, Exhibit C: Savista tagged accounts, subject to 2.5% contingency rate for prior year==

DocuSign Envelope ID: 69078825-C4D6-4282-8E9D-8210C370063B

**SOW, EXHIBIT A**
**OPEN ACCOUNT SUMMARY, SUBJECT TO 42% FEE**

| Gross Charges ($) | Net Charges ($) | Ins Pay ($) | Gross AR ($) | Net AR ($) |
|---|---|---|---|---|
| $63,675,285.71 | $59,214,135.14 | $26,011,949.63 | $37,499,277.13 | $34,290,304.97 |

29927 -124837
CR-0678

DocuSign Envelope ID: 69078825-C4D6-4282-8E9D-8210C370063B
Case: 1:23-cv-06445 Document #: 17-1 Filed: 10/31/23 Page 19 of 20 PageID #:88

**SOW, EXHIBIT B**
**VOLUME OF CLAIMS SUBJECT TO 8% FEE**

# Of claims to be processed via bot:
- Rejections - ~40,505 claims
- Denials or Partially paid claims - ~735,997 claims
  - Appeals - ~119,505 claims
    - 2nd Appeals - ~ 614,004 claims

29927 -124837
CR-0678
6

**SOW, EXHIBIT C**
**ACCOUNT SUMMARY, SUBJECT TO 2.5% FEE**

| Gross Charges ($) | Net Charges ($) | Ins Pay ($) | Gross AR ($) | Net AR ($) |
|---|---|---|---|---|
| $228,393,626.02 | $197,111,428.32 | **$40,016,113.73** | $188,375,654.36 | $158,468,628.00 |